to please the Court. We believe for the defense that there were at least five significant issues that should cause this Court to remand. Counsel, my interest in this, in your issues lies mainly in their assertion. They were preserved as affirmative defenses, as I recall, in the pleading. But then, with respect to, I think, every single one of the issues you raised, they were not the subject of a motion to dismiss for failure to state a claim. They were not the subject of motion for summary judgment, and they were not the subject for judgment as a matter of law. There was agreement on the verdict form. There was agreement on the instructions that put all this to the jury. And I don't think the issues you raised on appeal were raised until after the jury had finished its work and returned a verdict. Every one of them might have been cured had they been raised before a verdict. What am I missing? I don't disagree with your view of the record, except for our view being that the standing issue can be raised at any time. It's not waived. Constitutional standing can be raised at any time. However, the standing issues that you assert before us are not Article III constitutional standing. They're California statutory provisions for who can sue. That's more in the nature of failure to state a claim upon which relief can be granted, kind of like I can't state a claim upon which relief can be granted because of a car accident that hurt somebody else's car and somebody else's body, but I just happen to know of it. You could call that standing. I have no standing to assert their injuries, but it's not Article III constitutional standing that can be raised at any time. It's failure to state a claim upon which relief can be granted because I'm not the guy that was hurt. And that's waivable, and that cannot be asserted at any time. So why isn't everything waived? When you say everything, there were — Every point that you've raised in your appeal. Well, there were two other issues besides the standing issues, which you believe cannot be raised at this time. One of them was the remediator issue, because the trial court had decided to reduce the verdict by a million dollars, and it appeared to the trial judge that the plaintiffs had acceded to that by virtue of what they had done earlier in terms of suggesting a $3 million sum. But the plaintiffs never, in fact, acceded to it. I thought that as a vial they have accepted the remediator. Well, that's untimely, Your Honor. How can we tell whether they accepted or didn't accept? I mean, we're not fact-finders. No, I don't disagree with that. But the record doesn't show an acceptance on the record of the reduced amount at any time. And at the time of the filing of the cross-appeal, it's very clear at that point in time, they weren't accepting anything. They were challenging the order. Mr. Sonner, I have a kind of a related question to Judge Plainfell's, although it's actually quite different. It strikes me that this case was tried on the theory that the Fourth and Fourteenth Amendment claims were the same. That is, that they all arose out of excessive use of force. I recognize that the Fourteenth Amendment claim also should require deliberate indifference, but there was no objection to the instructions. The damages instruction and the damages part of the special verdict form directed the jury to consider damages to the plaintiffs, not to the decedent. Which is consistent with a Fourteenth Amendment claim, but not with a Fourth Amendment claim. So, bottom line, to me, it looks like all eight plaintiffs have standing on a Fourteenth Amendment claim because no notice claim is required. Therefore, the verdict stands unless the damages are excessive and under the appropriate standard of review, we can reverse the district court's determination on that issue. Now, have I got that right or wrong? I think the Court has got it right, except we have a point on the record. I think the Court has got it right.     The Court has got it wrong. And I think based on the record, it was a general verdict form. And so, yes, that was the Fourteenth Amendment claim was the only non-flawed claim. But if you had multiple claims and some were defective, that the Court could not take the verdict as it was, even if there was one valid claim. Well, I don't understand that point because the verdicts ask, was the defendant – did the defendant use unreasonable force? Answer, yes. And what were the damages? And was the defendant negligent? Answer, yes. Now, the negligence claim I recognize has got standing issues associated with it. So let's just toss it out or at least toss it out, except as to two plaintiffs who do, I think, have standing on the negligence claim. I think no one had standing. Well, I think two of them did file a notice of claim. And if they did, then they would have standing on the negligence claim, because I don't agree with you that it depends upon survival. I think it was a wrongful death claim. But never mind that. Okay? The evidence clearly supports a verdict on excessive use of force. No objection to the instructions. No objection to the verdict form. So why does it stand? Well, that still leaves us with the excessive verdict argument, which we don't think is flawed in terms of standing issues. I mean, we have a $4 million claim as it originally stood. Only three of the plaintiffs testified for only limited portions of time. Well, as such, why does that make any difference? Now, it may well be, and I'll talk to Mr. Hoffman about this, it may well be that the evidence that those three adduced is too thin or speculative to stand up. It's possible. But just because only three of them testified, why are we in a math game here? I don't think we're in a math game, Your Honor. I think it's the quality of the testimony provided by whoever testified it. And there was no quality given to establish the justification for the kind of a damage award that the jury rendered here. It was clear that you had an absentee father who had not been around his children for a period of 15 years for various reasons. The children did not give substantial testimony to show a strong, loving relationship with the father over that time period. Well, the district judge who was on site and on scene declined to say, explicitly declined to say that the damages were excessive. So my question is, why should we override that much more percipient call? I think the record has the very limited testimony that was the basis of the award and the judge's action. And we're saying that as a matter of law, whatever the trial judge did, it's not just a question of abusive discretion. It's a question of whether there's substantial evidence to support the verdict, either in its original form or in the remitted form. Yeah, but we, our rule is that you uphold a jury verdict unless the amount is grossly excessive or monstrous. Clearly not supported by the evidence or based only on speculation or guesswork. And the district court didn't think so. So what's the basis for our saying that was manifestly wrong? I think it was clearly excessive on the basis of the evidence that was presented to the trial court. He erred. He also believed that the plaintiffs had exceeded to their remitted amount, and that was as far as he was going to go until he realized that they hadn't accepted it at all. And he said, shouldn't this be a new trial then if you didn't agree to it? But would have, could have, should have. I mean, what he did was to say explicitly the damages weren't excessive. And I agree. He messed up the remittitor. I mean, it was, it's a mess. But you're asking us to reverse the determination on excessiveness, right? I'm sorry? You're asking us to grant a new trial on damages based on the fact that the damages were excessive. Yes. Counsel, it seems to me that whatever mess there is in this case is because the defense did not do its job before a verdict came in. All of a sudden, after losing, then the defense starts demanding that all sorts of things be sorted out. And it's very difficult to sort them out. When the case has already gone to the jury and you've had a verdict on the form that it is. I wonder if, what there, what is there that could not have been sorted out before the verdict came in and was properly raised only after the verdict came in other than your And I guess your claim that the remittitor was not properly accepted. Well, those two issues clearly come up after, after the jury award. The other four, yes, they could have been raised before, but we believe that they could be raised at any time, although the Court is indicating now that while it may be a standing issue, it's not a constitutional standing. The word standing is used in different senses. Yes. I just don't agree with you on that. On the damages, had you requested a different verdict form so that they could be sorted out by person and by the nature of the injury, then it would be much easier to deal with your argument. But all we have is an overall figure. Well, then the Court has to determine whether, as a matter of law, the overall number provided by the jury is outrageous or excessive. I think we're obligated under the procedural law regulating appeals from jury verdicts to take everything most favorably to the verdict. And also we're obligated to defer to the district judge's exercise of discretion. Isn't that correct? Normally, yes, except as to the two issues that we don't reach, according to the Court's view, we'll understand that. Well, look. Okay. So the remitter is messed up. It represented now that it was accepted. I mean, that's the plaintiff's position. It was accepted. Yeah, but that's what they say, but it's after the notice of appeal was filed. I understand that. Just hear me out. They say it was accepted. It would be pretty tough for them to go back on that word or that representation in district court. So if we send it back and say, look, you didn't give the plaintiffs an option, give them an option. So they take it. We're right back where we started from, aren't we? I think what was happening here is the trial judge had believed that they had accepted it. They don't have an option when appeals file. I'm with you. It was all messed up. My question is, now the plaintiffs have represented. They say they accepted it. I realize that we can't – I don't think we can tell whether it was accepted or not accepted. But if we send it back to the district court and say, you did this wrong because you entered judgment without giving the plaintiffs a choice of whether to accept or admit it or go for a new trial, if the plaintiff's word is worth anything, and I think Mr. Hoffman's is, then you know what they're going to do. They're going to say, we accepted it or we accept it. So now what have we accomplished by this remand? Our view is that it wouldn't be a remand for that determination. They failed to accept it within any reasonable time before the appellate process started, and therefore, as a matter of law, it required a new trial to be granted, not to give the judge another option to say, okay, you accepted. Why? I don't think there's another limit. And the only thing at issue is whether or not they've accepted the remediator. If they hadn't accepted the remediator within a timely time period before the appellate process started, our view was that it required the trial court to give defendants a new trial on damages, and so that the judge would not have the opportunity then to give them another opportunity. He was shocked when he saw the notice of appeal. It was the judge and or some party's fault that that happened, because the form of the order wasn't correct. That is, the form of the order did not say we'll grant a new trial conditioned upon your acceptance of the remediator. So he gave them no choice. So I find it very hard to say that that the fact that they did not explicitly make a choice before the judgment was entered wasn't the fault of the order, and nobody corrected the form of the order. Do I understand correctly you don't challenge the liability finding in this appeal? It's just damages. Yes. Dollars and cents is all we're talking about here. Yes. Has anyone given any thought to whether our mediation service would be useful in that respect? Why don't you think about it, Will? I don't know whether what the clients might view as an opportunity or not, and I won't know that while the Court is in session. Is it possible for us to notify the clerk's office after argument? We'll let you know if that's in the card. Okay. So I don't need it. I don't need to determine that issue for us. If you wanted a trial that just focused on what sketchy people the plaintiffs were instead of whether the police were brutal killers, you could have conceded liability. I don't think we ever believed that the police officers involved were killers who acted with excessive force. No, but the jury... That was the jury's verdict, and we were bound by that verdict in terms of it wasn't a question of no evidence being on the record. That left us with... It seems to me that that's what your appeal would get. Your first trial focuses on whether the police were brutal killers or whether the plaintiffs were a bunch of liars, and the jury decided the police were brutal killers. Then you get a whole new trial where how the police acted totally out of the case. The whole case is about what sketchy people the plaintiffs are. And you get that by lying in the weeds and not asserting any of your affirmative defenses by motion and just bringing them up after losing so you get a second shot. I don't agree with the court's view that everybody on the defense side was laying in the weeds and raising defenses. I wasn't there, but nevertheless, I don't believe the record shows a tactical decision to lay in the weeds to raise the issue only on appeal. Okay. Let's hear from Mr. Hoffman. Good morning. This is Paul Hoffman appearing for the Mitchell family. In light of the Court's questions in the colloquy, maybe I should focus on the remediator and the damages. I mean, we... Our view of the case is the view expressed in the questions, and we've laid that out in our brief. We certainly think that the judgment can be affirmed on the 14th Amendment claim alone, and it was only wrong for that damages. There's absolutely no question about that. Mr. Hoffman, the difficulty that I see, at least, with the damages, more or less just mentioned a minute ago, is that the father didn't say anything at all about the decedent's relationship with the father or the mother, that is, with the parents. Right. He just said he lives here. The three kids who testify used, I'm sorry, conclusory buzz-type words to describe their father and gave no substantial indication of anything about a personal relationship. And, of course, nobody testified that, even so, the relationship was the same with respect to all of them. Well, let me address those points directly. First of all, with respect to the mother and father, because we accepted the remediator, and I know we have to deal with that separately, the mother and father didn't get a judgment, so it's only the six children. Well, no, but I'm talking about the evidence. I'm not talking about... What I'm saying is that the damages were awarded based on the remediator to the six children and their relationship, so the excessiveness would have to be determined with respect to the kids. Now, I think that, obviously, the starting point is that the jury heard this testimony and the judge heard the testimony, and they came to the conclusions that they came. In the case of the jury, they cut back on what the plaintiff's counsel requested to a certain amount, and the judge, having heard everything and reducing it for the parents and otherwise, came down to what he came to. Danielle Mitchell actually did testify about the fact that the father treated all of the kids as one family, even though the kids were from different mothers. Well, I think she actually said that he said that he wished for the kids to treat all of their siblings as a family. Well, I think that they... I mean, I think what the testimony was, as construed most favorably to the plaintiff, would be that the father did encourage them to act like a family with each other and with him. There's no... There's, for example, no testimony that they ever got together as a family. You know, they didn't get together for any occasions or... They didn't have a lot of detail, for sure, about those kinds of things. I mean, there was testimony by one of the kids about him taking him to amusement parks, playing football with him, doing the kinds of things that fathers do with sons. There's also testimony by Robert Mitchell that he not only had a close relationship with his father, but named his first child after him. And being someone whose son named his first child after me, I can say that that is pretty strong evidence for ordinary people in a jury to know what the bond is. I think that Danielle did testify that she observed that all of her brothers and sisters had a good relationship with their father. Now, she didn't give detail about that, but she testified about it in front of the jury. Darren testified about the fact that not only he had a beautiful relationship, that was the general way that he described it, and he was a younger kid at the time, as was Danielle at the time of the testimony. But that he talked to his father every day, that he talked to his father about everything, talked to his father about life. With respect to the numbers, if you were a jury, you know, and juries try to figure this out in whatever way they figure it out, but they had a table about life expectancy which showed that he would have a life expectancy of 32.3 years. Now, what that works out to is $33.93 a day per kid. And so the question is, when your father is gunned down by the sheriff's department and they leave you without a father for the rest of your life in all the ways that everybody understands that fathers are necessary, and they describe the closeness of the relationship, and I think as we showed in the Hayashi case, you don't have to have everybody testify for a wrongful death lump sum award. You just don't. I mean, in Hayashi, it was a mother and one daughter out of a mother and five daughters, and they got a lump sum award. And so this was testimony that, you know, sure, could they have elaborated more on the amusement parks, described in more detail whether all the kids went to Disneyland or not? The jury had heard these kids directly in front of them talk about their relationship and understood it to be a good one and understood this. Which claims did they prevail on of all the theories, these six? Well, I mean, there's a general verdict. So, I mean, all of the plaintiffs, all eight plaintiffs prevailed on all three claims that were in front of the jury. Now, the one I agree with Judge Kleinfeld that there's a lot of these arguments were waived and it's not Article III standing. They don't have a case that says that these issues are Article III standing. And I think the judge, if you look at the new trial order, was pretty clear that he thought they were lying in the weeds and not raising things. When he asked them to bring a motion, they didn't, and they waited until the end. And, you know, I think in terms of what you can affirm on, though, say there are problems with the two other claims. We don't concede that, but say there are. On the 14th Amendment claim, there's absolutely no issue about that. Everybody acknowledges that everybody had standing for that claim. There was no issue about state law. There was wrongful death damages, which were appropriate, if anything now probably than what they could get under Section 1983. They haven't challenged the liability verdict. They haven't challenged the jury instructions, which included a deliberate indifference instruction. And they haven't, well, but they didn't challenge it. I mean, I think the Court was right. If the defense had made certain objections or had preserved certain issues or came out on appeal, they had made certain arguments, you might have to think about it differently, but they didn't. And so I think you really are left with the issue of the damages. And I really think that for a jury to give $33 a day to these six children for not having a father, and, you know, I think that there's a lot of implication in what they're saying about in their brief. They say, well, this is not a Hayashi family, so you have to have a picket fence and everybody has to be together in order to get a large number of damages. I think that a jury in our community can decide that this man had a close relationship with his kids, that his kids missed that companionship and that loss. They were specifically instructed not to give damages for the things that they weren't supposed to, including survival damages. That was explicitly excluded from their consideration. And I think when the judge, I mean, the judge made lots of comments, and I know that in the briefs the judge says lots of things, but I think the proof in the pudding is what did the judge do? What the judge did after expressing whatever doubts and issues he had, which he called the steering mechanism, and, you know, I've appeared before Judge Kelleher before. This is the way he does things, right? He decided that it was appropriate, based on everything he heard in this case, to give these children $2.4 million. That's $400,000 a plaintiff. That's about $12,000 a year, $33 a day. We've presided, I mean, there's cases that go all over the place. But in contrast, for example, to Nelson. In Nelson, the award in one of their key cases gets overturned because it's $2 million for the parents of a kid that the parents had no relationship with for 20 years. They didn't know his address. They didn't know his telephone number. They didn't know he had medical conditions. They didn't know he was a drag act. They didn't know a single friend that he had. There was no evidence of a relationship. In this case, you had three of the six kids testify about what kind of guy this was, what kind of relationship they had. And the jury, hearing that, understanding it, believed that this was what they were entitled to for losing this man at age 40, at the time of their lives when they probably needed a father figure more than anything, including telephone calls, including infrequent visits. Maybe they would be more frequent. I think, Judge Kleinfeld, you're absolutely right about what they wanted out of this. They wanted they waited, and now they want a damaged child divorced of everything, and they're going to try to go after Mr. Mitchell. That's what they want. They could have done that. In fact, the judge chastised them for not cross-examining the kids more aggressively. They could have done that, too. They chose to try this case the way they chose to try it, and if I just might say one thing on the remitter, because I don't want to skip over that. We did accept the remitter. Now, it's true that the way that the judge did it was not the way that you should do it, probably, but we suggested the remitter. He accepted the suggestion. The defense is candid about saying that the judge accepted what we invited him to do. We then filed a motion for attorney's fees based on the remitted judgment. The motion says, based on this judgment, we're asking you for fees, and the defendants filed the motion. They then file a notice of appeal. Now, if they really believed we hadn't accepted the remitter and we had a new trial, there's no final judgment. Why did they file a notice of appeal? They're asking us about us. What happened there, candidly what happened, is that they filed a notice of appeal, and the trial was, I don't know what that means. Does that mean that everything's up for grabs? Because it's clear that the judge made mistakes in the remitter. He took out the mother and father. They should have had a judgment award for them, but he had accepted the remitter, and under Donovan he couldn't take it back. And so that's why the appeal went nowhere, because he didn't have a right to appeal. You still have an attorney's fees claim? Yes. I mean, it's been deferred because the judge deferred it pending the resolution of the appeal. So that matter hasn't been decided by Judge Kelleher at all. It would only be decided if the decision was made. Well, if we leave things as they are, if we affirm, you'll go back and pursue the attorney's fees? Yes. I mean, if the judgment is affirmed, we would renew the motion for attorney's fees in front of Judge Kelleher. Okay. I don't know if the Court has any other questions. Anything else? Anything further? Thank you very much. Thank you, Mr. Hoffman. Thank you, counsel. The matter just argued will be submitted. And the next to your argument in United States v. Ferguson.
judges: Rymer, Kleinfeld, Silverman